JUSTICE TRIEWEILER
dissenting.
I dissent from the majority opinion.
I do not disagree that several instances of Elmer Baldridge’s conduct while teaching high school students in Colstrip, Montana, were inappropriate. However, as our standard of review properly requires, I would defer to the County Superintendent’s judgment regarding the credibility of witnesses, the context of Baldridge’s comments, and the impact of those isolated comments on his fitness as a teacher.
The Superintendent heard and observed the witnesses against Baldridge, and heard and observed Baldridge’s explanation for his comments, as well as his cross-examination. Ultimately, she concluded that the witnesses against Baldridge belonged to a clique directly related to a school board member involved in efforts to discharge Baldridge and that their credibility was suspect. She also concluded that Baldridge’s description of events, and the student witnesses who testified on his behalf, were credible.
Since the Superintendent’s findings of fact are uncontested, and since the majority opinion is based on its conclusion that Baldridge is unfit to teach, several findings related to his fitness are noteworthy. Therefore, I take this opportunity to set them forth in their entirety.
3. Baldridge has an excellent reputation as a teacher and person in the school and community. The School Board Chairman testified Baldridge evaluations were excellent prior to this incident [referring to the glove incident]. Teachers and students testified *64 Baldridge was one of the best teachers they had ever known and was dedicated to the school and his profession.
4. Undisputed testimony revealed Baldridge received the highest possible evaluation the School District offers in every category and in every evaluation he had received.
5. Baldridge often challenged alleged discrimination against Native American students, bringing his concerns to both the administration and School Board.
7. Respondent High School Principal was Eileen Pearce. Pearce testified Baldridge was viewed as a good teacher and had excellent teaching skills. Baldridge could relate well with students. The sole critical evaluation Baldridge received related to his relationship with the District Superintendent Tokerud.
10. Holly Granlund and Bill Medved were teachers in Respondent School District. They testified about Baldridge as a teacher. They concurred Baldridge was able to teach a variety of areas, that he was competent and a supporter of activities-of the school. They also testified Baldridge spent more time in the school than other teachers and was considered a “model teacher.”
Juxtaposed with Baldridge’s excellent credentials as a teacher, however, was his activism as a member of the teachers’ collective bargaining unit which the Superintendent found placed him in an adversarial role with the administration. He chaired the grievance committee, attended School Board meetings, occasionally questioned administrative decisions, and brought up subjects sensitive to the administration during School Board meetings. While the Superintendent found that he was at no time insubordinate, he was known to be a “thorn in the side” of the School Superintendent and School Board because of his activist role.
Having established the context in which the complaints against him arose, it is important to my consideration of his fitness to consider the Superintendent’s specific findings regarding each of his alleged offenses.
THE GLOVE INCIDENT
Superintendent Barrick found that the evidence regarding the incident and the students’ perception of the incident conflicted. Several students perceived it as a reference to a female examination, *65 several others interpreted it as a chauvinistic solicitation of help to wash dishes. She weighed the testimony, found that the incident was not of concern to students at the time, was not perceived as a derogatory sexual statement at the time and did not affect the student-teacher relationship between Baldridge and his students, nor his abilities to perform his duties in the classroom. She found it peculiar that the incident occurred on March 30, 1988, and was not complained of until April 11. She found it significant that neither the complaining parents nor the principal in her letter to the Superintendent attached any sexual connotation to the comment.
STOP, DROP, AND BLOW INCIDENT
Barrick made the following finding regarding this incident:
I heard and observed Baldridge’s testimony and the testimony of the other students. I find the testimony of Baldridge to be credible. I find that there was no offensive meaning intended by these comments and there was no sexual connotation attached to these words. This was a form of expression used by Baldridge to enforce his policy of handing work in on time dealing with a student who had contested Baldridge’s grading system.
If this finding is uncontested, as the majority concedes, then Baldridge’s comment to “stop, drop, and blow” cannot serve as the basis for concluding that he was unfit to teach.
TWENTY DOLLARS TO MAKE STUDENT CRY
The Superintendent found that Baldridge made the statement to several students that he would “give you twenty bucks if you make that kid cry.” Baldridge admitted he made these statements. However, the students involved testified that they did not believe he seriously intended that they physically assault another student and the Superintendent found “no basis for including this allegation as a basis for the termination of Baldridge nor was the statement intended to harm or threaten any student or person.”
TESTES REFERENCE
Superintendent Barrick made the following undisputed finding regarding Baldridge’s reference to testes:
Baldridge admitted telling a joke in class that involved the term “testes”. Baldridge further testified he had used that particular joke for five years. In its worst interpretation, this joke is innocuous and, if deemed inappropriate by the School Board, should have *66 been handled with a warning to stop this activity. No warning was ever provided. Student David Grover testified another teacher, during the same time period, at the same school, told a similar joke. Connie Ramsey, testified that her husband, a math teacher at Colstrip High School, had used a similar joke. No evidence was presented that any of these teachers were warned about the telling of this joke.
Superintendent Barrick found that these comments were an acceptable form of communication at the school at the time and had not offended any student and had not adversely affected Baldridge’s relationship with his students.
REFERENCE TO PRICKING FINGER
Baldridge admitted making references to pricking his finger but denied any phallic reference. Students testified that there was not a phallic interpretation of his comments. The Superintendent found that the statements were made but that the intent of the reference was to “an irritation reference instead of any phallic reference and did not offend the students or suggest a sexual connotation at the time.” She also found that the incident did not affect Baldridge’s relationship with his students.
FLIPPING OFF INCIDENT
Several students testified that while such an incident occurred it was not done with the “classic connotation.” Superintendent Barrick found:
I find these incidents occurred. I further find such behavior was inappropriate and not commonplace. However, I also find the gesture was not intended or perceived as offensive by any student at the time.
TIME OF MONTH INCIDENT
Baldridge admitted stating to a student who had remarked that she could not stand the sight of blood that “she must have a rough month” or words to that effect. He also stated that he instantly recognized the potential for misunderstanding and immediately apologized to the student in front of the whole class and again after class. Superintendent Barrick found after listening to the testimony of Baldridge and the student to whom the comment was made that:
I am persuaded by the testimony of both Thea Simpson and Baldridge that this episode was an honest “slip-of-the-tongue,” *67 after consideration of all of the circumstances. Baldridge immediately apologized in front of the class and then again on a one-on-one basis. Thea Simpson found his apology sincere. I find this action demonstrates an affirmative response to an embarrasing situation and recognition not to repeat this statement.
The Superintendent found that this comment did not adversely affect Baldridge’s relationship with his students and was not a basis for dismissal of a tenured teacher.
I also find it significant that although these incidents are alleged to have occurred over a significant period of time, there was no prior effort to discipline Baldridge because of his classroom behavior and, in fact, no prior warnings that anything he had done in the classroom or in the presence of students was inappropriate. While I conclude that several of Baldridge’s remarks and, specifically, his gesture in the presence of students were inappropriate, the Superintendent, who listened to the witnesses and considered Baldridge’s excellent credentials as a teacher, apparently believed that repetition of those incidents could have been prevented by a warning and that termination of an admirable career in teaching was unnecessary. It is obvious from the Superintendent’s findings that she also felt that Baldridge’s politics and relationship with the Superintendent were the more likely basis for his termination than any of the incidents complained of.
Because I believe that the Superintendent who listened to the witnesses, including the teacher involved, was in the best position to analyze the context of his remarks and judge his fitness to teach in light of not only those remarks but his entire record, I would give greater weight to those findings than the majority had done. I also conclude that based on those findings, when considered in their entirety, the Superintendent did not err as a matter of law when she concluded that the School District had not proven that Baldridge was unfit to teach.
For these reasons I dissent from the majority opinion.
JUSTICE HUNT joins in the foregoing dissenting opinion.